IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | CIVIL ACTION NO. 05CV2866 |
| ) | Judge Petrese B. Tucker |
| STATE OF PENNSYLVANIA, CITY OF ) | |
| PHILADELPHIA, STATE OF OHIO, AND ) | |
| STATE OF OKLAHOMA, ) | |
| ) | |
| Plaintiff-Intervenors, ) | |
| v. ) | |
| ) | |
| SUNOCO, INC., ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ ) | |

**MEMORANDUM IN SUPPORT OF UNITED STATES'
MOTION TO ENTER CONSENT DECREE**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES

MEMORANDUM IN SUPPORT OF UNITED STATES' MOTION TO ENTER CONSENT
DECREE
   I.  INTRODUCTION AND SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

   II. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
       A.  Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
       B.  Statutory and Regulatory Framework . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
          (1)  New Source Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
          (2)  Flaring and New Source Performance Standards . . . . . . . . . . . . . . . . 13
          (3)  Leak Detection and Repair ("LDAR") . . . . . . . . . . . . . . . . . . . . . . . . 13
          (4)  Benzene Waste NESHAP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
       C.  EPA's Petroleum Refinery Initiative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
       D.  The Violations Alleged in the United States' Complaint. . . . . . . . . . . . . . . 17
       E.  The Terms of the Settlement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
          (1)  Emission Reductions from the FCCUs . . . . . . . . . . . . . . . . . . . . . . . . 19
          (2)  Emission Reductions from Heaters and Boilers . . . . . . . . . . . . . . . . . . 19
          (3)  Reduction of Emissions from Sulfur Recovery Plants . . . . . . . . . . . . . 20
          (4)  Reduction of Flaring Events and Related Emissions . . . . . . . . . . . . . . 21
          (5)  Implementation of Enhanced LDAR and Benzene NESHAP
              Compliance Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
          (6)  Total Emission Reductions/Cost . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
          (7)  Civil Penalty and Supplemental Environmental Projects . . . . . . . . . . 24
          (8)  Resolution of Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

   III.  STANDARD OF REVIEW APPLICABLE TO CONSENT DECREES . . . . . . . . 26
       A. General Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
       B. The Legal Standard to Be Applied . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

   IV.  THE CONSENT DECREE IS FAIR, REASONABLE, AND CONSISTENT WITH
       THE PUBLIC INTEREST AND THE GOALS OF THE RELEVANT
       ENVIRONMENTAL STATUTES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
       A.  The Consent Decree is Procedurally and Substantively Fair. . . . . . . . . . . 31
          (1)  Procedural Fairness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

       (2)  Substantive Fairness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

     B.  The Decree Is Reasonable, Adequate and Consistent with the Goals of the

        Relevant Environmental Statutes.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37


V.   THE COMMENTS TO THE PROPOSED CONSENT DECREE DO NOT

       PROVIDE A BASIS FOR REJECTING THE SETTLEMENT.  . . . . . . . . . . . .  39


VI.   CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

CERTIFICATE OF SERVICE

SERVICE LIST

APPENDIX A - UNITED STATES' RESPONSE TO SPECIFIC COMMENTS RECEIVED
WITH RESPECT TO THE PROPOSED CONSENT DECREE

     US-EPA MEMORANDUM: STATE IMPLEMENTATION PLANS (SIPS): POLICY
     REGARDING EXCESS EMISSIONS DURING MALFUNCTIONS, STARTUP, AND
     SHUTDOWN

APPENDIX B - COMMENTS RECEIVED  PURSUANT TO 28 C.F.R. § 50.7, PUBLISHED
NOTICE OF THE PROPOSED CONSENT DECREE
70 FED. REG. 36409-10 (JUNE 23, 2005)

**TABLE OF AUTHORITIES**

American Paper Inst. v. U.S. EPA, 660 F.2d 954, 963 (4th Cir. 1981) . . . . . . . . . . . . . . . . . . . . 32

Aro Corp v. Allied Witan Co., 531 F.2d 1368 (6th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . 6

Citizens for a Better Env't v. Gorsuch, 718 F.2d 1117 (D.C. Cir. 1983) . . . . . . . . . . . . . . . 27, 29

Donovan v. Robbins, 752 F.2d 1170 (7th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

E.E.O.C. v. Hiram Walker & Sons, Inc., 768 F.2d 884 (7th Cir. 1985) . . . . . . . . . . 3, 31, 33, 36

Great Neck Capital Appreciation Inv. Partnership, L.P. v. Pricewaterhouse Coopers, L.L.P.
212 F.R.D. 400 (E.D.Wis. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 33

Harris v. Pernsley, 654 F. Supp. 1042 (E.D. Pa.), aff'd, 820 F.2d 592 (3d Cir. 1987) . . . . . . . 30

In re Tutu Water Wells, 326 F.3d 201 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 29

Makah Indian Tribe v. U.S., 501 U.S. 1250 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Officers for Justice v. Civil Service Commission, 688 F.2d 615 (9th Cir. 1982), cert. denied sub
nom., Byrd v. Civil Service Commission, 459 U.S. 1217 (1983) . . . . . . . . . . . . . . 7, 26, 27, 29, 30

Pennwalt Corp. v. Plough, Inc., 676 F.2d 77 (3d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Sam Fox Publ'g Co. v. United States, 366 U.S. 683 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

SEC v. Randolph, 736 F.2d 525 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . 4, 26, 27, 29, 30, 39

Sunoco, U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837 (1984) . . . . . . . . . . 31

Union Carbide Corp. v. Natural Res. Def. Council, Inc., 467 U.S. 1219 (1984) . . . . . . . . . . . . 27

United States v. Akzo Coatings of Am. Inc., 949 F.2d 1409 (6th Cir. 1991) . . . . . . . . . . . . . 28, 37

United States v. Alcan Aluminum, Inc., 1993 WL 232194, at *2-3 (E.D. Pa. 1993) . . . . . . . . . 28

United States v. Armour & Co., 402 U.S. 673 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 37

United States v. Atlas Minerals, 851 F. Supp 639 (E.D. Pa. 1994) . . . . . . . . . . . . . . . . . . . . . . 28

United States v. Bechtel Corp., 648 F.2d 660 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . 28

United States v. BP Exploration & Oil Co., 167 F. Supp. 2d 1045 (N.D. Ind. 2001) . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 30, 32, 33, 38

United States v. Cannons Eng'g Corp., 899 F.2d 79 (1ˢᵗ Cir. 1990) . . . . . . . . . 28, 29, 31, 33, 37

United States v. City of Jackson, 519 F.2d 1147 (5th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . 27, 36

United States v. Comunidades Unidas Contra La Contaminacion, 204 F.3d 275 (1ˢᵗ Cir. 2000)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 28, 325, 33

United States v. District of Columbia, 933 F. Supp. 42 (D.D.C. 1996) . . . . . . . . . . . . . . . . . . 32

United States v. Hooker Chem. & Plastics Corp., 776 F.2d 410 (2nd Cir. 1985) . . . . . . . . . . . 26

United States v. Jones & Laughlin Steel Corp., 804 F.2d 348 (6th Cir. 1986) . . . . . . . . . . 26, 30

United States v. Kramer, 19 F. Supp. 2d 273 (D.N.J. 1998) . . . . . . . . . . . . . . . . . . . . . . . . 29

United States v. Microsoft Corp., 56 F.3d 1448 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . . . 39

United States v. Nicolet, Inc., 1989 WL 95555, *3 (E.D. Pa. 1989) . . . . . . . . . . . . . . . . . . 26

United States v. Ohio Edison, 276 F.Supp.2d 829 (S.D. Ohio 2003) . . . . . . . . . . . . . . . . . . 34

United States v. Oregon, 913 F.2d 576 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . 8, 28, 30, 38

United States v. Southeastern Pa. Transp. Auth., 235 F.3d 817 (3d Cir. 2000) . . . . . . . . . . . 8, 29

United States v. Union Elec. Co., 132 F.3d 422 (8th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . 26

Van Bronkhorst v. Safeco Corp., 529 F.2d 943 (9th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . 26

## FEDERAL STATUTES

Clean Air Act ("CAA") , 42 U.S.C. § 7401, *et seq.* . . . . . . . . . . . . . . . . . . . 2, 4, 8, 13, 14, 15, 18

## FEDERAL REGULATIONS

28 C.F.R. § 50.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 39

New Source Performance Standards ("NSPS") & Prevention of Significant Deterioration/New Source Review ("PSD/NSR") Emission Limits 40 C.F.R. §§ 51.165, 52.21(b)(2)(i), 52.21(b)(23)(i), 52.21(i), 52.21(j), 52.21(k), 52.24, 60.11(d), Part 61, and Part 81 . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6, 10, 11, 12, 13, 14, 16

70 Fed. Reg. 36409-10 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO.  05CV2866 |
| | ) | Judge Petrese B. Tucker |
| COMMONWEALTH OF PENNSYLVANIA, | ) | |
| CITY OF PHILADELPHIA, STATE OF OHIO, | ) | |
| AND STATE OF OKLAHOMA, | ) | |
| | ) | |
| Plaintiff-Intervenors, | ) | |
| v. | ) | |
| | ) | |
| SUNOCO, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF UNITED STATES'
MOTION TO ENTER CONSENT DECREE**

The United States of America, on behalf of the United States Environmental Protection

Agency ("EPA"), respectfully submits this Memorandum in support of its motion to enter the

proposed Consent Decree lodged with this Court on June 16, 2005, in the above-styled action.

The Consent Decree resolves the claims of the United States against Sunoco, Inc. ("Sunoco") for alleged violations of the Prevention of Significant Deterioration ("PSD") provisions, the New Source Performance Standards provisions, the leak detection and repair provisions, and the benzene waste emissions control provisions of the Clean Air Act, ("CAA" or "Act"), 42 U.S.C. §§ 7401-7671, and the portions of the Pennsylvania, Ohio, and Oklahoma State Implementation Plans ("SIPs") that incorporate or implement the above federal provisions. The Decree also resolves the claims of the Commonwealth of Pennsylvania, the States of Ohio, and Oklahoma, and the City of Philadelphia through the Philadelphia Air Management Service (hereinafter, "Plaintiff-Intervenors") against Sunoco under the Clean Air Act and under their respective SIPs. The Plaintiff-Intervenors support this Motion.

## I.    INTRODUCTION AND SUMMARY

This is an environmental settlement with Sunoco, Inc. ("Sunoco"), a major petroleum refiner which owns and operates four facilities located in the states of Pennsylvania, Ohio, and Oklahoma. The settlement is the most recent in a series of Consent Decrees arising out of EPA's Petroleum Refinery Initiative, an enforcement initiative targeting non-compliance with the Clean Air Act throughout the petroleum refining industry. The Refinery Initiative focuses on maximizing environmental benefit and enforcement resources by securing broad relief and significant reductions in pollution emissions across each refiner's entire system, rather than pursuing potential claims on a facility-by-facility or unit-by-unit basis. A total of 13 settlements have been approved to date by Federal District Courts,[1]/ and other negotiations are ongoing.

---

[1]/       See United States v. BP Exploration & Oil Co., 167 F. Supp. 2d 1045 (N.D. Ind. 2001); United States v. Conoco, Inc., Civil No. 01-0871 (W.D. LA); United States v. Motiva Enterprises, LLC, Civil No. 01-0978 (S.D. TX.); United States v. Navajo Refining Co., Civil No. 01-1422 (D. NM);  United States v.

Like other settlements under the Refinery Initiative, the proposed settlement in this matter resolves Sunoco's potential liability under the relevant provisions of the Clean Air Act in exchange for Sunoco's commitment to undertake a variety of activities directed at substantially reducing the emissions of key air pollutants from Sunoco's refineries. Under the proposed Consent Decree, Sunoco has agreed to install and operate innovative pollution control technologies that will reduce emissions of nitrogen oxides ("NOx"), sulfur dioxide ("SO$_2$"), and particulate matter ("PM") from refinery process units (principally the fluidized catalytic cracking units ("FCCUs") and process heaters and boilers) by approximately 24,000 tons per year consistent with best available control technology ("BACT") standards and new source performance standards ("NSPS") emissions limits.

In addition, under the proposed Consent Decree, Sunoco will: (1) adopt and implement comprehensive, facility-wide, enhanced monitoring and fugitive emission control programs for benzene and other volatile organic compounds; (2) employ significantly improved engineering practices to eliminate excess flaring of hydrogen sulfide; (3) control and monitor carbon monoxide emissions to ensure that Sunoco's FCCU meets applicable NSPS limits; (4) control and monitor flaring devices, heaters and boilers, and sulfur recovery plants to ensure compliance with NSPS 40 C.F.R. Part 60, Subparts A and J; (5) meet NSPS and Prevention of Significant Deterioration/New Source Review ("PSD/NSR") emissions limits for PM at most FCCUs;

---

Marathon Oil Co., Civil No. 01-40119 (E.D. MI.); United States v. Koch Industries, Inc., Civil No. 00-2756 (D. MN.); United States v. Lion Oil Company, Civil No. 03-1028 (W.D.AK.); United States et al. v. Sunoco, Inc., Civil No. 03-04525 (D. NJ.); United States et al. v. CHS Inc., Civil No. 03-153 (D. MT.); United States et al. v. Ergon Refining, Inc. et al., Civil No. 03-01140 (S.D. MS.); United States et al. v. Citgo Petroleum Corp. et al., Civil No. 04-03883 (S.D.TX.); United States v. Chevron U.S.A., Inc.,Civil No. 05-00021 (E.D.TX.); United States v. Conoco-Phillips, Civil No. H-05-0258 (S.D. TX)

- 3 -

(6) develop and implement hydrocarbon flaring plans to minimize hydrocarbon flaring events; and (7) install a tail gas unit at the existing sulfur recovery plant and install a second sulfur recovery plant with a tail gas unit at its Toledo refinery. The injunctive relief program goes well beyond regulatory requirements and will establish new refinery standards for control technology and CAA compliance. Moreover, Sunoco's commitments under the Consent Decree must be incorporated into federally-enforceable permits, and thus will have a substantial and lasting beneficial impact on environmental quality in the communities where the refineries are located. The Consent Decree further requires Sunoco to pay $3.0 million in civil penalties and to spend at least $3.5 million on several supplemental environmental projects to be performed in the vicinity of Sunoco's refineries.

The United States filed its Complaint against Sunoco concurrently with the lodging of the Consent Decree. The violations of the Clean Air Act alleged in the Complaint are significant and supported by EPA's knowledge of the refining industry and by specific information regarding Sunoco's operations. However, Sunoco has raised significant factual and legal defenses to the allegations. Very early in the negotiations, the parties recognized the benefits of avoiding protracted litigation of the governments' claims and Sunoco's defenses. In particular, the parties recognize that through early settlement, resources that would otherwise have been spent on litigation could be allocated to environmental improvements at the four refineries. Likewise, settlement without litigation conserves and maximizes the effectiveness of government resources. See SEC v. Randolph, 736 F.2d 525, 528 (9th Cir. 1984) (the use of settlement agreements "encourages informal resolution of disputes, thereby lessening the risks and costs of litigation"); Aro Corp v. Allied Witan Co., 531 F.2d 1368, 1372 (6th Cir. 1976) (settlements conserve the

resources of the courts, the litigants, and the taxpayers and "should . . . be upheld whenever equitable and policy considerations so permit").

The United States invited the Commonwealth of Pennsylvania, the States of Ohio and Oklahoma, and the City of Philadelphia through the Air Management Service ("AMS")[2]/ to participate in the negotiation of a global settlement. Each of these entities eventually agreed to participate in settlement discussions and have joined as signatories to the proposed Consent Decree. Accordingly, the States of Pennsylvania, Ohio and Oklahoma and AMS have filed Complaints-in-Intervention alleging similar claims under the Clean Air Act and related state and local regulations, which claims will also be resolved by the Consent Decree.

Once engaged in negotiations, the parties to the proposed Consent Decree devoted thousands of hours over many years to working through the numerous technical issues and to ensuring that the Consent Decree's terms accurately reflect the technical solutions devised by the parties' engineers. Thus, the settlement is the product of the parties' deliberations regarding the technical feasibility of the compliance measures, an assessment of the merits of the parties' respective positions regarding numerous legal issues, a weighing of the risks and delays that litigation would entail, and consideration of the value of an early settlement, including the significant environmental benefits that will accrue from Sunoco's implementation of the comprehensive injunctive measures required by the Decree. Through this Consent Decree, "each side gains the benefit of immediate resolution of the litigation [and potential litigation] and some measure of vindication for its position while foregoing the opportunity to achieve an

_____

[2]/      AMS is the local agency in Pennsylvania with air regulatory authority over Sunoco's Philadelphia refinery.

unmitigated victory." E.E.O.C. v. Hiram Walker & Sons, Inc., 768 F.2d 884, 889 (7th Cir. 1985), citing United States v. Armour & Co., 402 U.S. 673, 681, 91 S. Ct. 1752, 1757 (1971) (additional citations omitted).

Pursuant to 28 C.F.R. § 50.7, the United States published notice of the proposed Consent Decree in the Federal Register on June 23, 2005, see 70 Fed. Reg. 36409-10 (2005), and provided the public with an opportunity to comment on the proposed settlement. The lodging and comment period provides an opportunity for public scrutiny and judicial review of the settlement. It is also an opportunity for the United States to respond to questions from the public and to correct any misconceptions about the terms of the agreement. The comment period extended for just over 30 days, from June 22 to July 25, 2005.

During the public comment period, the United States received three separate submissions commenting on the Consent Decree: one from a citizens group in Philadelphia, one from a citizens group in Toledo and one from a private individual (collectively referred to as the "commenters") (See Appendix B herein). The comments are similar in nature and fall generally into one of four categories: (1) the Consent Decree does not adequately address certain issues at the refineries including pollution prevention, opacity violations and monitoring; (2) the Consent Decree allows inappropriate exceptions to the law; (3) the Consent Decree does not obtain adequate penalties or supplemental environmental projects; and (4) the Consent Decree raises some general concerns including the timing of implementation of injunctive relief, and the measurement of actual emissions reductions. The comments raise several specific examples which are discussed jointly herein and responded to in detail in the attached Appendix: United

States' Response to Public Comments Received Regarding Proposed Consent Decree (attached as Appendix A to this Memorandum).

Consistent with other settlements under EPA's Petroleum Refinery Initiative, the United States has secured from Sunoco a broad package of injunctive relief across its refinery system before pursuing full discovery and litigation of each potential claim on a unit-by-unit basis. Though the United States has alleged significant violations against Sunoco, Sunoco has disputed and continues to dispute those violations. As discussed in more detail below, any litigation involving the alleged violations, particularly relating to the NSR regulations, would likely be technically complex, lengthy, expensive, and resource-intensive. Moreover, there is substantial risk inherent in such litigation, and there is no guarantee that the United States could achieve comparable relief or do so in a reasonable time frame. Given these realities, the commenters' unduly narrow interpretation of settlement adequacy is simply not applicable in the present case. See Officers for Justice v. Civil Service Comm'n, 688 F.2d 615, 624 (9th Cir. 1982) ("Of course, the very essence of a settlement is compromise, a yielding of absolutes and an abandonment of highest hopes.")

The United States disagrees with the commenters' evaluation of the Decree. The United States believes that the Consent Decree, when evaluated in light of the full extent of relief provided, provides a substantial and appropriate level of environmental benefit consistent with the goals of the relevant statutes. Moreover, when considered in the context of the nature and status of the claims at issue and the risk inherent in pursuing non-settlement alternatives, the Consent Decree represents a very favorable and eminently fair and reasonable resolution consistent with the appropriate standards for negotiated settlements.

The United States has reviewed and carefully considered each of the comments received in light of the terms of the Consent Decree and the requirements of the statutes that serve as a predicate for the United States' claims against Sunoco. In this Memorandum and the attached Appendix, the United States will summarize and respond to the comments received. This will enable the Court to consider the proposed Consent Decree in light of the comments received and the United States' responses, and to determine whether the settlement meets the standards of fairness, reasonableness, consistency with the relevant statutory goals, and is in the public interest. In this process, the function of a reviewing Court is not to substitute its judgment for that of the parties to the Decrees, but to assure itself that the terms of the Decrees are fair and adequate and are not unlawful, unreasonable, or against public policy. United States v. Oregon, 913 F.2d 576, 580 (9th Cir. 1990) (before approving Consent Decrees, district court must be satisfied that Decree is fundamentally fair, adequate and reasonable, and in conformity with applicable laws), cert. denied, 501 U.S. 1250 (1991). In re Tutu Water Wells, 326 F.3d 201, 207 (3d Cir. 2003), citing, United States v. Southeastern Pa. Transp. Auth., 235 F.3d 817, 823 (3d. Cir. 2000). If the Court finds that these standards have been met, then the settlement should be entered.

The United States and the Plaintiff-Intervenors believe that the terms of the proposed Consent Decree further the objectives of the environmental laws upon which the Complaints are based. The relief requested of this Court, as embodied in the proposed Decree, is an appropriate response to the violations alleged and, for many units and processes, exceeds applicable regulatory requirements and will establish new, more stringent, refinery standards for CAA compliance. In short, the proposed Consent Decree resolves the United States' and Plaintiff-

Intervenors' claims against Sunoco in a way that is fair, reasonable, and protective of public health and the environment. For the reasons set forth herein, the United States respectfully requests that this Court make such a finding and approve and enter the proposed Consent Decree as a final judgment.

## II. BACKGROUND

A. <u>Factual Background</u>

Sunoco operates four petroleum refineries for the manufacture of various petroleum-based products, including gasoline, diesel, jet fuels, and other marketable petroleum by-products. Sunoco's refineries have a combined processing capacity of approximately 760,000 barrels per day. Petroleum refining involves the physical, thermal and chemical separation of crude oil into marketable petroleum products. The petroleum refining process at Sunoco's refineries results in emissions of significant quantities of the following regulated air pollutants: $NO_X$, $SO_2$, carbon monoxide ("CO"), PM, and VOCs, including benzene. The primary sources of these emissions are the fluidized catalytic cracking units ("cracking units" or "FCCUs"), the process heaters and boilers, the sulfur recovery plants, the wastewater treatment system, fugitive emissions from leaking components, and flares throughout the refinery where excess emissions are combusted.

B. <u>Statutory and Regulatory Framework</u>

The Clean Air Act established a regulatory scheme designed to protect and enhance the quality of the nation's air so as to promote the public health and welfare and the productive capacity of its population. Section 101(b)(1) of the Act, 42 U.S.C. § 7401(b)(1). Section 109 of the Act, 42 U.S.C. § 7409, requires the Administrator of EPA to promulgate regulations

establishing primary and secondary national ambient air quality standards ("NAAQS" or "ambient air quality standards") for certain criteria air pollutants.  The primary NAAQS are to be adequate to protect the public health, and the secondary NAAQS are to be adequate to protect the public welfare, from any known or anticipated adverse effects associated with the presence of the air pollutant in the ambient air.

Section 110 of the Act, 42 U.S.C. § 7410, requires each state to adopt and submit to EPA for approval a State Implementation Plan ("SIP") that provides for the attainment and maintenance of the NAAQS.  Under Section 107(d) of the Act, 42 U.S.C. § 7407(d), each state is required to designate those areas within its boundaries where the air quality is better or worse than the NAAQS for each criteria pollutant, or where the air quality cannot be classified due to insufficient data.  These designations have been approved by EPA and are located at 40 C.F.R. Part 81.  An area that meets the NAAQS for a particular pollutant is classified as an "attainment" area; one that does not is classified as a "non-attainment" area.

(1)  <u>New Source Review</u>

Part C of Title I of the Act, 42 U.S.C. §§ 7470-7479, sets forth requirements for the prevention of significant deterioration ("PSD") of air quality in those areas designated as attaining the NAAQS standards.  These requirements are designed to protect public health and welfare, to assure that economic growth will occur in a manner consistent with the preservation of existing clean air resources and to assure that any decision to permit increased air pollution is made only after careful evaluation of all the consequences of such a decision and after public participation in the decision-making process.  These provisions are referred to herein as the "PSD program."  Section 165(a) of the Act, 42 U.S.C. § 7475(a), prohibits the construction and

subsequent operation of a major emitting facility in an area designated as attainment unless a PSD permit has been issued. Section 169(1) of the Act, 42 U.S.C. § 7479(1), defines "major emitting facility" as a source with the potential to emit 250 tons per year (tpy) or more of any air pollutant. As set forth at 40 C.F.R. § 52.21(k), the PSD program generally requires a person who wishes to construct or modify a major emitting facility in an attainment area to demonstrate, before construction commences, that construction of the facility will not cause or contribute to air pollution in violation of any ambient air quality standard or any specified incremental amount.

As set forth at 40 C.F.R. § 52.21(i), any major emitting source in an attainment area that intends to construct a major modification must first obtain a PSD permit. "Major modification" is defined at 40 C.F.R. § 52.21(b)(2)(i) as meaning any physical change in or change in the method of operation of a major stationary source that would result in a significant net emission increase of any criteria pollutant subject to regulation under the Act. "Significant" is defined at 40 C.F.R. § 52.21(b)(23)(i) in reference to a net emissions increase or the potential of a source to emit any of the following criteria pollutants, at a rate of emissions that would equal or exceed any of the following: for ozone, 40 tons per year of volatile organic compounds (VOCs); for carbon monoxide (CO), 100 tons per year; for nitrogen oxides (NOx), 40 tons per year; for sulfur dioxide ($SO_2$), 100 tons per year, (hereinafter "criteria pollutants"). As set forth at 40 C.F.R. § 52.21(j), a new major stationary source or a major modification in an attainment area shall install and operate best available control technology ("BACT") for each pollutant subject to regulation under the Act that it would have the potential to emit in significant quantities.

Part D of Title I of the Act, 42 U.S.C. §§ 7501-7515, sets forth provisions which direct States to include in their SIPs requirements to provide for reasonable progress towards attainment

of the NAAQS in nonattainment areas. Section § 172(c)(5) of the Act, 42 U.S.C. § 7502(c)(5),

provides that these SIPs shall require permits for the construction and operation of new or

modified major stationary sources anywhere in the nonattainment area, in accordance with

Section 173 of the Act, 42 U.S.C. § 7503, in order to facilitate "reasonable further progress"

towards attainment of the NAAQS. Section 173 of Part D of the Act, 42 U.S.C. § 7503, requires

that in order to obtain such a permit the source must, among other things: (a) obtain federally

enforceable emission offsets at least as great as the new source's emissions; (b) comply with the

lowest achievable emission rate ("LAER") as defined in Section 171(3) of the Act, 42 U.S.C. §

7501(3); and (c) analyze alternative sites, sizes, production processes, and environmental control

techniques for the proposed source and demonstrate that the benefits of the proposed source

significantly outweigh the environmental and social costs imposed as a result of its location,

construction, or modification.

As set forth in 40 C.F.R. § 52.24, no major stationary source shall be constructed or

modified in any non-attainment area as designated in 40 C.F.R. Part 81, Subpart C ("non-

attainment area") to which any SIP applies, if the emissions from such source will cause or

contribute to concentrations of any pollutant for which a NAAQS is exceeded in such area,

unless, as of the time of application for a permit for such construction, such plan meets the

requirements of Part D, Title I, of the Act. A state may comply with Sections 172 and 173 of the

Act by having its own non-attainment new source review regulations approved as part of its SIP

by EPA, which must be at least as stringent as those set forth at 40 C.F.R. § 51.165.

(2)  Flaring and New Source Performance Standards

Section 111 of the Act, 42 U.S.C. § 7411, requires EPA to promulgate standards of performance for certain categories of new air pollution sources ("New Source Performance Standards" or "NSPS").  Pursuant to Section 111(b), 42 U.S.C. § 7411(b), EPA promulgated general regulations applicable to all NSPS source categories.  Those general regulations are set forth at 40 C.F.R. Part 60 Subpart A and include requirements for implementing and utilizing good air pollution control practices at all times; EPA's NSPS regulations applicable to petroleum refineries are set forth at 40 C.F.R. Part 60 Subpart J.  FCCU regenerators, sulfur recovery plants, and fuel gas combustion devices (including heaters, boilers, and flares) are among the refinery process units subject to regulation under the NSPS requirements.

(3)  Leak Detection and Repair ("LDAR")

Section 112 of the CAA, 42 U.S.C. § 7412, requires EPA to promulgate emission standards for certain categories of sources of hazardous air pollutants ("National Emission Standards for Hazardous Air Pollutants" or "NESHAPs").  Pursuant to Section 112(d) of the CAA, 42 U.S.C. § 7412(d), EPA promulgated national emission standards for equipment leaks (fugitive emission sources).  Those regulations are set forth at 40 C.F.R. Part 61 Subpart J, Part 63 Subparts H and CC, and Part 60 Subparts VV and GGG.  The focus of the LDAR program is the refinery-wide inventory of all possible leaking valves (which could be tens of thousands in a medium-size refinery), the regular monitoring of those valves to identify leaks, and the repair of leaks as soon as they are identified.

(4)  Benzene Waste NESHAP

In the 1990 amendments to the Clean Air Act, Congress defined "hazardous air pollutant" and identified 189 pollutants under Section 122(b)(1) that would be subject to regulation.  The Act requires EPA to establish emission standards for each pollutant in accordance with Section 112(d) of the CAA, 42 U.S.C. § 7412(d).  In March 1990, EPA promulgated national emission standards applicable to benzene-containing waste streams.  Benzene is a listed hazardous air pollutant and a known carcinogen.  The benzene waste regulations are set forth at 40 C.F.R. Part 61 Subpart FF, "National Emission Standard for Benzene Waste Operations."  Benzene is a naturally-occurring constituent of petroleum products and petroleum waste and is highly volatile.  Benzene emissions can be detected anywhere in a refinery where the petroleum product or waste materials are exposed to the ambient air.  Refineries are required to tabulate their total annual benzene emissions.  If the total annual benzene emissions is over 10 megagrams, the refinery is required to elect a control option that will require the control of all waste streams, or control of certain select waste streams.

C.  EPA's Petroleum Refinery Initiative

Since 1996, EPA has pursued a coordinated, multi-faceted approach to enforcing Clean Air Act compliance within the refining industry as part of its Petroleum Refinery Initiative.  Using multiple sources of information, including inspections, information requests, and industry trade information regarding production increases and modifications at specific refineries over the past several decades, EPA identified four CAA programs where non-compliance appeared widespread among petroleum refiners: (1) apparent major modifications to the FCCUs resulting in significant increases in NOx and $SO_2$ emissions without complying with the PSD or NSR

requirements for permitting and without the installation of pollution control technology; (2) flaring of acid gases, which consist primarily of hydrogen sulfide, and failure to adequately treat sulfur emissions as required by NSPS Subparts A & J; (3) failure to accurately identify and minimize fugitive emissions throughout the refinery as required by the LDAR regulations; and (4) failure to manage benzene waste streams in accordance with the Benzene Waste NESHAP. EPA subsequently initiated inspections and developed broad information requests pursuant to its CAA Section 114 investigative authority to further develop its enforcement effort.

Rather than immediately pursuing costly and time-consuming enforcement litigation on a piecemeal basis, EPA embarked on a series of multi-issue, multi-facility settlement negotiations with major petroleum refining companies directed at addressing the above compliance issues on a global, system-wide basis with each refiner. In preparation for discussions with specific refiners regarding these compliance issues, the United States assembled a team of national experts from EPA who worked with the Department of Justice to develop a "model" program for injunctive relief under each of the four major CAA program areas discussed above. The model program contemplates the use of innovative technologies, to include Selective Catalytic Reduction ("SCR"), Selective Non-Catalytic Reduction ("SNCR") and the use of NOx-reducing catalyst additives, and/or stringent emissions limits for the control of NOx emissions from the FCCUs and process heaters and boilers. It further contemplates a mix of technologies, including installation of wet gas scrubbers on the cracking units, operational controls, the use of $SO_2$-reducing catalyst additives, and/or stringent emissions limits to reduce $SO_2$ emissions.

Under the LDAR and Benzene Waste NESHAP model programs, each refinery is required to implement enhancements that go well beyond existing federal regulations. The

Benzene Waste enhanced program includes regular laboratory and program audits, quarterly benzene balances, and replacement of carbon emission filters as soon as any emissions of benzene above background are detected. The enhanced LDAR program requires each refinery to use a lower internal leak definition, e.g., a valve is considered "leaking" when emissions of 500 ppm are detected, as opposed to the 10,000 ppm federal regulatory definition. The lower leak definition is designed to identify potential leaks at an earlier stage so that repairs can be made before emissions become significant. The program also requires internal and third-party audits, more frequent monitoring, more immediate attempts to repair leaking components, and the use of innovative technologies such as computerized dataloggers for monitoring.

In addition, the model program contemplates that all refineries must agree to comply with the NSPS provisions that require control of $SO_2$ emissions from sulfur recovery plants. For many refineries this will require the installation of additional emissions control equipment (tail gas units) so that when the primary unit is shut down for repair, gases can be rerouted to the backup unit rather than flared to the atmosphere. The flaring program also requires the development of specific procedures, which may include installation of flare gas recovery systems, to reduce or eliminate flaring at each refinery and the implementation of "good air pollution control practices" at all times, in accordance with 40 C.F.R. § 60.11(d).

Since March 2000, the United States has used the model injunctive relief program as a framework for a series of major Clean Air Act settlements with petroleum refiners. In each case, the parties utilized the model relief program and then customized the Consent Decrees to address particular compliance issues at the relevant refineries. Not including the present case, the United States has concluded global settlements with 14 refiners responsible for more than 60% of

domestic refining capacity and is negotiating with other refiners representing a significant additional percentage of capacity. As noted above, each of these prior 14 settlements have been approved by Federal District Courts. This settlement is structured consistent with, and comparable to, the 14 other judicially approved Consent Decrees entered to date.

     D. <u>The Violations Alleged in the United States' Complaint</u>.

     The United States' Complaint primarily alleges violations of the statutory and regulatory provisions relevant to the four Clean Air Act program areas targeted in EPA's Petroleum Refinery Initiative. Count One alleges, upon information and belief, that Sunoco has violated the PSD/NSR requirements, and the corresponding provisions of the relevant State SIPs, by undertaking major modifications of its FCCUs and process heaters and boilers without undergoing PSD/NSR review, without obtaining all appropriate permits, and without installing the best available control technology and/or meeting the lowest achievable emission rate for the control of those pollutants for which a significant net emissions increase occurred. Counts Two through Five allege, upon information and belief, violations of the NSPS requirements applicable to FCCU catalyst regenerators, sulfur recovery plants, flaring devices, and heaters and boilers at the Sunoco refineries. Count Six alleges, upon information and belief, violations of the federal LDAR requirements at each of Sunoco's refineries. Count Seven alleges, upon information and belief, violations of the Benzene Waste NESHAP at each of Sunoco's refineries. For each of the alleged violations in Counts One through Seven, the United States seeks both injunctive relief and civil penalties pursuant to Section 113(b) of the Clean Air Act.

     The Complaints-in-Intervention filed by the Plaintiff-Intervenors contain claims against Sunoco under the Clean Air Act that are similar to the United States' claims. To varying extents,

the Plaintiff-Intervenors also allege violations of their respective state implementation plans and associated regulations.

E.  The Terms of the Settlement

During the course of negotiations, Sunoco raised a number of factual, technical and legal defenses to the above allegations.  However, the parties subsequently agreed to set aside extensive discovery and litigation in the interest of a comprehensive settlement, and Sunoco has agreed to comply with the extensive injunctive requirements in the Consent Decree.  Among its obligations under the Decree, the most significant of which are summarized below, Sunoco must comply with stringent emission limits, utilize new technologies, and implement improved operational practices across all of its refineries with respect to EPA's four CAA program areas of concern.  Sunoco's compliance will result in substantial, timely, enforceable emissions reductions.  Given the very real uncertainties inherent in pursuing the claims against Sunoco in litigation, there is a strong likelihood that the relief achieved through the settlement is consistent with or exceeds the relief that ultimately could have been achieved through litigation of the disputed issues.

(1)  Emission Reductions from the FCCUs

The FCCU typically emits more NOx and $SO_2$ emissions than any other single unit at a refinery.  Under the terms of the Consent Decree, Sunoco is required to install wet gas scrubbers and SCR that will significantly reduce emissions of NOx and $SO_2$ from three FCCUs at its refineries.  Wet gas scrubbers and SCR are the best control technology available today to limit or control emissions of these pollutants.

Further, for the purpose of controlling NOx emissions, Sunoco will accept stringent emission limits for these FCCUs. Specifically, Sunoco will comply with a NOx emission limit of 20 ppmvd @ 0% O2 on a 365 day rolling average basis and 40 ppmvd @ 0% O2 on a 7 day rolling average basis at these refineries by the dates specified for installation of the wet gas scrubbers and SCR.

Likewise for each FCCU, Sunoco must comply with an $SO_2$ emission limit of 25 ppmvd @ 0% O2 on a 365 day rolling average basis and 50 ppmvd @ 0% O2 on a 7 day rolling average basis by the dates specified in the Consent Decree.

Pursuant to the Consent Decree, Sunoco is required to incorporate the lower NOx and $SO_2$ emission limits established under the Decree into federally-enforceable operating permits. Sunoco must demonstrate future compliance with the lower emission limits through the use of continuous emissions monitoring systems ("CEMS").

Additionally, Sunoco has agreed to greater controls of emissions of particulate matter (PM). At each of the FCCU's where Sunoco will install a wet gas scrubber, Sunoco also will either operate a new or existing electrostatic precipitator or accept a lower emissions permit limit of 0.5 lbs. PM per 1000 lbs of coke burned.

(2)  Emission Reductions from Heaters and Boilers

By no later than December 31, 2012, Sunoco must complete a program to reduce NOx emissions from the heaters and boilers at all refineries collectively by at least 50% (2,189 tons per year as compared to baseline emission levels from the years 2000-2001). Sunoco may only receive credit towards the emission reduction commitment for those heaters and boilers on which

- 19 -

it implements "qualifying controls," which include SCR, SNCR, and Ultra-Low NOx Burners. Sunoco must achieve two-thirds of the reductions by no later than four years from date of entry of the decree, and Qualifying Controls must be placed on at least 30% of all the heaters and boilers at Philadelphia and Marcus Hook by June 15, 2010 and at Toledo and Tulsa by eight years from the date of entry of the decree.[3]

Included in Sunoco's obligation to control sufficient units to achieve the committed NOx emission reductions is a specific requirement that Sunoco apply for and accept lower permitted emission limits for the controlled units. Future compliance with the lower emission limits must be determined through the use of CEMS or predictive emissions monitoring systems ("PEMS") for larger units and periodic performance testing for smaller units.

Sunoco also is accepting NSPS Subpart A & J applicability for heaters and boilers and must comply with the $SO_2$ emission limits for fuel gas combustion devices for all such heaters and boilers upon entry of the Consent Decree. In addition, Sunoco will not burn fuel oil in heaters and boilers except during periods of natural gas restriction. [4]

(3) Reduction of Emissions from Sulfur Recovery Plants

Sunoco operates sulfur recovery plants ("SRPs") at its Philadelphia, Marcus Hook and Toledo refineries. The Consent Decree requires Sunoco to accept NSPS applicability at all of its

---

[3] As discussed in the attached Appendix, in the United States' Response to Comments, Sunoco may meet this obligation in part through the use of emission reductions generated after the 2000-2001 baseline period but before the lodging of the Consent Decree.

[4] At the Tulsa refinery, Sunoco is required to meet NSPS limits for H2S for its fuel gas and recover at least 95% of the sulfur removed from fuel gas within eight years.

SRPs upon entry of the Decree.[5/]  This includes the requirement that Sunoco install a second SRU and two TGUs at the Toledo facility by the end of 2009 which will result in a substantial reduction in $SO_2$ emissions at that facility.

For all of its SRPs, Sunoco is required to implement an EPA-approved Preventive Maintenance and Operation Plan ("PMO Plan") that provides for continuous operation of its sulfur recovery plants between scheduled maintenance turnarounds to minimize emissions from those units including the institution of sulfur shedding procedures, and procedures that will ensure coordination of maintenance turnarounds of its sulfur recovery plants to coincide with scheduled turnarounds of major upstream sulfur producing units.  The goal of the PMO Plans is to eliminate acid gas flaring.

(4)  Reduction of Flaring Events and Related Emissions

The Consent Decree establishes a detailed, enforceable protocol designed to minimize the incidence and duration of flaring events and related sulfur dioxide emissions at Sunoco's refineries.  Within 45 days of any flaring incident, Sunoco must submit a report that documents Sunoco's investigation and analysis of the "root cause" of the incident, identifies the corrective action already undertaken or still to be undertaken, and provides other relevant information, such as the duration of the incident, the quantity of sulfur dioxide emitted, and the immediate steps that Sunoco took to limit the duration of the incident and/or quantity of sulfur dioxide emitted. EPA then will review the report to determine, inter alia, if the corrective action proposed or already undertaken is/was consistent with good engineering practice.  Where action is necessary,

_____

[5/]        Sunoco recently constructed a state-of-the art dual train SRP (with TGUs) at Marcus Hook which is not part of this decree.  Because of its size, the Tulsa refinery does not have a SRP.

Sunoco is required to undertake such interim and/or long term corrective actions as are consistent with good engineering practice to minimize the likelihood of a recurrence of the cause of a flaring incident. Sunoco is required to undertake similar procedures for tail gas incidents and hydrocarbon flaring incidents.

In addition, Sunoco is required to accept NSPS Subparts A & J applicability for all flaring devices at each of its refineries. Sunoco will have approximately two years to develop a compliance plan for all of its flaring devices and within those two years, at least 50% of Sunoco's system-wide flaring devices must meet one of three compliance methods.[6] Within five years, Sunoco will certify compliance with one of the three options at all of Sunoco's flaring devices.

The cumulative effect of these enhanced requirements will be to substantially reduce or eliminate flaring of hydrogen sulfide, from Sunoco's refineries, and to further minimize other flaring incidents. The reduction in flaring, as well as compliance with NSPS emission limits, will also reduce annual $SO_2$ emissions across Sunoco's refining system.

---

[6] Sunoco has agreed to accept NSPS applicability for all of the flaring devices at its refineries through the use of one of the following three methods: (1) operating and maintaining a flare gas recovery system; (2) operating the flaring device as an NSPS fuel gas combustion unit and monitoring the device with a CEMS or an alternative method approved by EPA; or (3) eliminating the routes of continuous or intermittent, routinely-generated refinery fuel gases to the flaring device.

(5) <u>Implementation of Enhanced LDAR and Benzene NESHAP
Compliance Programs</u>

Under the Consent Decree, Sunoco is required to adopt an "enhanced practices approach" that goes beyond the regulatory requirements to improve the control and management of fugitive emissions across all refineries.

With respect to the Benzene Waste NESHAP, Sunoco will for all refineries except Tulsa: (1) conduct a one time review and verification of the refinery's compliance with the Benzene Waste NESHAP; (2) correct all areas of non-compliance identified in the compliance review; (3) comply with stringent requirements for the use of carbon canisters as a control mechanism under the Benzene Waste NESHAP; (4) provide enhanced training; (5) ensure that all waste and slop oil is properly characterized for purposes of benzene NESHAP compliance; (6) undertake monthly sampling of uncontrolled benzene waste streams to ensure ongoing compliance; and (7) undertake corrective action if sampling demonstrates possible non-compliance.   For its Tulsa Refinery, which Sunoco has previously asserted is not subject to the control requirements in the Benzene Waste NESHAP because the TAB is below 10 megagrams, Sunoco has agreed to certify compliance with the 6BQ compliance option by no later than December 31, 2005.

Under the enhanced LDAR program, Sunoco will for each Refinery: (1) develop a comprehensive, written Refinery-wide LDAR program for the Refinery; (2) provide enhanced training; (3) retain third-parties to undertake LDAR audits and undertake internal audits of the Refinery's LDAR program; (4) implement corrective actions where audits show non-compliance; (5) monitor and repair valves and pumps that are leaking at a lower rate than the applicable regulatory leak rate, including performance of drill and tap on valves leaking in excess of 10,000

ppm, thereby reducing fugitive emissions; (6) increase the frequency of monitoring valves; and (7) utilize electronic data collection devices for all LDAR monitoring.

(6) Total Emission Reductions/Cost

The injunctive relief program will be implemented by Sunoco over a period of approximately eight years with a significant portion of the emissions reductions expected to occur within the first four years. Under the terms of the Consent Decree, Sunoco estimates that it will reduce NOx emissions by approximately 4,476 tons per year and emissions by approximately 19,526 tons per year. Reductions of fugitive VOC emissions $SO_2$ also are expected to result from performance under the Consent Decree. The cost of this program has been estimated by Sunoco to be approximately $250 million.

(7) Civil Penalty and Supplemental Environmental Projects

As part of the agreed-upon relief in this settlement, Sunoco will pay a civil penalty of $3 million. The penalty money will be allocated among the United States and the Plaintiff-Intervenors as set forth in the Decree.

In addition to paying the civil penalty, Sunoco will spend at least $3,900,000 to perform specific supplemental environmental projects ("SEPs") either at or in the general vicinity of its refineries. Sunoco will perform the following five projects: (1) install next generation technology on certain heaters and boilers at a cost of at least $1 million to achieve an additional reduction of 112 tons of NOx per year in southeast Pennsylvania over and above the reductions required by the CD; (2) provide $300,000 for a community health based program in southeast Pennsylvania; (3) provide $400,000 towards the acquisition of ultra low sulfur diesel for municipal vehicles in

southeast Pennsylvania; (4) construct a redundant power supply for the FCCU at the Philadelphia refinery for a cost of at least $1 million to prevent outages which cause unexpected emissions; and (5) provide $1.2 million for the acquisition of diesel retrofit packages for the municipal vehicles in southeast Pennsylvania.

(8)  Resolution of Claims

In exchange for Sunoco's performance of the injunctive relief required by the Consent Decree and payment of the civil penalty, the Consent Decree resolves the claims of the United States and the Plaintiff-Intevenors against Sunoco for violations of the applicable PSD/NSR, NSPS Subpart J, LDAR, and Benzene Waste NESHAP requirements that may have occurred prior to entry of the Consent Decree, including violations that began before the date of entry of the Consent Decree and that continued after the date of entry of the Consent Decree, but only for those specific units and for those specific pollutants that are expressly covered by the Consent Decree.  Thus, any modifications after the date of lodging or violations that occur or begin after the relevant compliance dates are not resolved by the Decree, and are subject to independent enforcement.

With respect to both the United States and the Plaintiff-Intervenors, the resolution of claims granted in the Consent Decree is, of course, contingent on Sunoco's compliance with the key requirements of the Decree.  If Sunoco violates one of the enumerated requirements, Sunoco loses much of the benefit of this resolution of claims provision.

## III.   STANDARD OF REVIEW APPLICABLE TO CONSENT DECREES

### A.  **General Principles**

"The initial decision to approve or reject a settlement proposal is committed to the sound discretion of the trial judge." <u>SEC v. Randolph</u>, 736 F.2d 525, 529 (9th Cir. 1984) (quoting <u>Officers for Justice v. Civil Serv. Comm'n</u>, 688 F.2d 615, 625 (9th Cir. 1982), <u>cert</u>. <u>denied</u> <u>sub</u> <u>nom.</u> <u>Byrd v. Civil Serv. Comm'n</u>, 459 U.S. 1217 (1983)); <u>accord</u> <u>United States v. Jones & Laughlin Steel Corp.</u>, 804 F.2d 348, 351 (6th Cir. 1986); <u>United States v. Hooker Chem. & Plastics Corp.</u>, 776 F.2d 410, 411 (2nd Cir. 1985); <u>United States v. Union Elec. Co.</u>, 132 F.3d 422, 430 (8th Cir. 1997).  Courts, however, exercise this discretion within the framework of certain policy principles applicable to the settlement process.

First, the reviewing court's discretion should be exercised with deference to the "strong public policy in favor of settlements, particularly in very complex and technical regulatory contexts." <u>United States v. Comunidades Unidas Contra La Contaminacion</u>, 204 F.3d 275, 280 (1st Cir. 2000). Voluntary settlements of disputes are favored by the Courts.

The Third Circuit has stated that:

> Voluntary settlement of civil controversies is in high judicial favor .
> . . [w]hen the effort [to settle] is successful, the parties avoid the
> expense and delay incidental to litigation of the issues; the court is
> spared the burdens of a trial and the preparation and proceedings
> that must forerun it.

<u>Pennwalt Corp. v. Plough, Inc.</u>, 676 F.2d 77, 80 (3d Cir. 1982).  Accord, <u>United States v. Nicolet, Inc.</u>, 1989 WL 95555, *3 (E.D. Pa. 1989);  <u>accord</u> <u>Hooker Chemical</u>, 776 F.2d at 411 (district court discretion should be exercised to further the strong public policy favoring voluntary

settlement); <u>Van Bronkhorst v. Safeco Corp.</u>, 529 F.2d 943, 950 (9th Cir. 1976) (voluntary settlement of disputes is clearly in the public interest). This public policy in favor of voluntary settlements recognizes the value of settlements in conserving judicial resources, <u>see</u> <u>Donovan v. Robbins</u>, 752 F.2d 1170, 1177 (7th Cir. 1985) (stating that "the desirability of encouraging out of court settlements in order to lighten the judicial caseload creates a presumption in favor of approving . . . settlement[s]"); minimizing time and money parties would otherwise expend in litigation, <u>see</u> <u>Randolph</u>, 736 F.2d at 528 (the use of settlement agreements "encourages informal resolution of disputes, thereby lessening the risks and costs of litigation"); <u>Citizens for a Better Env't v. Gorsuch</u>, 718 F.2d 1117, 1126 (D.C. Cir. 1983), <u>cert. denied sub nom. Union Carbide Corp. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 1219 (1984) (both the parties and the public benefit from the "saving of time and money that results from the voluntary settlement of litigation"), and "maximiz[ing] the effectiveness of limited law enforcement resources," <u>United States v. City of Jackson</u>, 519 F.2d 1147, 1151-52 (5th Cir. 1975).

Second, the reviewing court should accord deference to the judgment of the United States and its agencies in settling a matter. The Supreme Court, in <u>Sam Fox Publ'g Co. v. United States</u>, 366 U.S. 683, 689 (1961), emphasized the importance of deference to the United States regarding settlement: "Sound policy would strongly lead us to decline . . . to assess the wisdom of the Government's judgment in negotiating and accepting the . . . Consent Decree, at least in the absence of any claim of bad faith or malfeasance on the part of the Government in so acting."

The Circuit Courts have echoed this principle of deference to the United States. A court reviewing a settlement "should pay deference to the judgment of the government agency which has negotiated and submitted the proposed judgment." <u>Randolph</u>, 736 F.2d at 529 (citing

Marshall v. Holiday Magic, Inc., 550 F.2d 1173, 1178 (9th Cir. 1977)); Officers for Justice, 688 F.2d at 625); see also, United States v. Bechtel Corp., 648 F.2d 660, 666 (9th Cir. 1981) (balancing of competing interests affected by proposed Consent Decree "must be left, in the first instance, to the direction of the Attorney General").  The First Circuit has directed courts to "refrain from second-guessing the Executive Branch."  Cannons, 899 F.2d at 84.

Judicial deference to a settlement is "particularly strong where a Consent Decree has been negotiated by the Department of Justice on behalf of a federal administrative agency like EPA which enjoys substantial expertise in the environmental field."  United States v. Akzo Coatings of Am. Inc., 949 F.2d 1409, 1436 (6th Cir. 1991); see also Comunidades, 204 F.3d at 281 ("In environmental cases, EPA's expertise must be given the benefit of the doubt when weighing substantive fairness.") (internal quotations omitted); Cannons, 899 F.2d at 84 (deference toward settlements particularly compelling where a governmental agency with special expertise that is "committed to the protection of the public interest has pulled the laboring oar in constructing the proposed settlement").  Hence, a court's review of an environmental Consent Decree should be deferential. "The balance of competing interests must initially be left to the discretion of the Attorney General when the United States brings the action, especially when the Justice Department negotiated the Consent Decree on behalf an agency specially expert in the field." United States v. Atlas Minerals, 851 F. Supp 639, 648 (E.D. Pa. 1994); United States v. Alcan Aluminum, Inc., 1993 WL 232194, at *2-3 (E.D. Pa. 1993).

**B.  The Legal Standard to Be Applied**

In reviewing a Consent Decree, a district court must determine whether the proposed settlement fairly and reasonably resolves the controversy in a manner consistent with the public

interest and applicable law.  United States v. Oregon, 913 F.2d 576, 580-81 (9th Cir. 1990).

"Unless a Consent Decree is unfair, inadequate, or unreasonable, it ought to be approved."  SEC

v. Randolph, 736 F.2d at 529.

Thus, a reviewing court is not required to make the same in-depth analysis of a proposed

settlement that it would be required to make in order to enter a judgment on the merits after trial:

> The trial court in approving a settlement need not inquire into the precise legal rights of
> the parties nor reach and resolve the merits of the claims or controversy, but need only
> determine that the settlement is fair, adequate, reasonable and appropriate under the
> particular facts and that there has been valid consent by the concerned parties.

Citizens for a Better Env't v. Gorsuch, 718 F.2d at 1126; accord Officers for Justice, 688 F.2d at

625.

The relevant standard "is not whether the settlement is one which the court itself might

have fashioned, or considers as ideal, but whether the proposed decree is fair, reasonable, and

faithful to the objectives of the governing statute."  United States v. Kramer, 19 F. Supp. 2d 273,

280 (D.N.J. 1998) (quoting United States v. Cannons Eng'g Corp., 899 F.2d 79, 84 (1st Cir.

1990)).  Accord, In re Tutu Water Wells, 326 F.3d 201, 207 (3d Cir. 2003) ("A court should

approve a proposed Consent Decree if it is fair, reasonable, and consistent with CERCLA's

goals"), citing, United States v. Southeastern Pa. Transp. Auth., 235 F.3d 817, 823 3d. Cir. 2000).

Thus, although the approval of a settlement is a judicial act committed to the informed discretion

of the trial court, the court cannot "substitute its judgment for that of the parties nor conduct the

type of detailed investigation required if the parties were actually trying the case."  BP

Exploration, 167 F. Supp. 2d at 1050.  Nor should the court judge the proposed settlement

"against a hypothetical or speculative measure of what might have been achieved by the

negotiators." Officers for Justice, 688 F.2d at 626 (citations omitted). Ultimately, "[t]he court need only be satisfied that the decree represents a 'reasonable factual and legal determination.'" Oregon, 913 F.2d at 581 (quoting United States v. City of Miami, 664 F.2d 435, 441 (5th Cir. 1981) (Rubin, J. concurring)).

Ensuring that the settlement is in the public interest is but one factor to be considered by the Court and does not alter the fundamental reasonableness standard or the policy of deference to the settling agency. Randolph, 736 F.2d at 529 (holding that the district court applied "too strict a standard" when it "closely scrutinize[d] the proposed decree to see if it was in the public's best interest"). Even where a Consent Decree affects the public interest or third parties, "the court need not require that the decree be 'in the public's *best* interest' if it is otherwise reasonable." Oregon, 913 F.2d at 581 (quoting Randolph, 736 F.2d at 529 (emphasis in original)).

The court's role in considering a proposed decree is a limited one, "[t]he court may either approve or disapprove the settlement; it may not rewrite it." Harris v. Pernsley, 654 F. Supp. 1042, 1049 (E.D. Pa.), aff'd, 820 F.2d 592 (3d Cir. 1987). The question to be resolved in reviewing the settlement, and the degree of scrutiny to be applied, are distinct from the merits of the underlying action. Officers for Justice, 688 F.2d at 630; Jones & Laughlin Steel, 804 F.2d at 351 (a court does not have the power to modify a Consent Decree; it may only accept or reject the terms to which the parties have agreed.)

In sum, this Court's role in reviewing the proposed Consent Decree is limited to approval or denial, based on an evaluation of the fairness and reasonableness of the settlement as presented by the parties. The Court must conduct this evaluation in the context of the strong

public policy supporting settlement.  Moreover, the Court should give substantial deference to EPA's and DOJ's interpretations of applicable environmental laws and regulations as well as to EPA's engineering and scientific determinations, see, e.g., Sunoco, U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 843-44 (1984); American Paper Inst. v. U.S. EPA, 660 F.2d 954, 963 (4th Cir. 1981).

## IV.  THE CONSENT DECREE IS FAIR, REASONABLE, AND CONSISTENT WITH THE PUBLIC INTEREST AND THE GOALS OF THE RELEVANT ENVIRONMENTAL STATUTES.

As discussed above, in reviewing a Consent Decree, a district court must determine whether the proposed settlement fairly and reasonably resolves the controversy in a manner consistent with the public interest and applicable law.  As demonstrated below, the proposed Decree satisfies this standard for district court approval of a settlement:  the settlement is fair, reasonable, and in the public interest and in accord with the relevant environmental statutes.  Accordingly, the Court should sign and enter the Decree.

A.      The Consent Decree is Procedurally and Substantively Fair.

Procedural fairness concerns the negotiations process, i.e., whether it was open and at arms-length.  BP Exploration, 167 F. Supp. 2d at 1051 (citing Cannons, 899 F.2d at 93).  To determine whether a proposed settlement is substantively fair, courts look to factors such as the strengths of the plaintiff's case versus the amount of the settlement offer, the likely complexity, length and expense of litigation, the amount of opposition to the settlement, the opinion of competent counsel, the stage of the proceeding, and the amount of discovery undertaken.  Great Neck, 212 F.R.D. at 409 (citing E.E.O.C. v. Hiram Walker & Sons, Inc., 768 F.2d 884, 889 (7th

Cir. 1980)); <u>BP Exploration</u>, 167 F. Supp. 2d at 1051.  When measured against each of these factors, this settlement is both procedurally and substantively fair.  As set forth in greater detail below, the commenters' assertions to the contrary are without merit.

        1.     <u>Procedural Fairness</u>

The settlement embodied in the proposed Decree is the product of extended, arms-length negotiations.  Representatives of the United States and Sunoco, including their respective legal counsel and engineers, labored over each provision of the proposed Decree during both in-person meetings and numerous conference calls over the course of many months.  In most of these discussions, representatives of the Plaintiff-Intervenors also participated and provided input on the substance and language of the Decree.  In short, the negotiation process was conducted in good faith and entirely consistent with longstanding government practices for resolving disputed claims.

One of the commenters, however, raises a complaint purporting to relate to procedural fairness, indicating that they were not invited to participate in the negotiation process.  As explained in the attached Appendix, this complaint is not well founded  and does not impact upon the procedural fairness of the Consent Decree.  There is no requirement that the Government allow third parties to participate in settlement negotiations.  <u>BP Exploration</u>, 167 F. Supp. 2d at 1052.  <u>See</u> <u>also</u>, <u>Comunidades</u>, 204 F.3d at 279 (1st Cir. 2000).  Consequently, the mere failure to include a third party in settlement negotiations does not in and of itself render a resulting Consent Decree procedurally unfair.  <u>See</u> <u>United States v. District of Columbia</u>, 933 F. Supp. 42, 48 n.6 (D.D.C. 1996).

2.    Substantive Fairness

Substantive fairness is determined after considering "a comparison of the strengths of the plaintiff's case versus the amount of the settlement offer; the likely complexity, length and expense of litigation; the amount of opposition to the settlement among affected parties; the opinion of competent counsel; and the stage of the proceedings, and the amount of discovery already undertaken at the time of settlement." Hiram Walker, 768 F.2d at 889; see also Great Neck, 212 F.R.D. at 409.  Because these concepts do not lend themselves to "verifiable precision[,] [i]n environmental cases, EPA's expertise must be given 'the benefit of the doubt when weighing substantive fairness.'"  United States v. Comunidades Unidas Contra La Contaminacion, 204 F.3d 275, 281 (1ˢᵗ Cir. 2000) (quoting Cannons, 899 F.2d at 88).

The comparison of the strength of the plaintiff's case against the proposed relief is most indicative of substantive fairness.  The United States has alleged significant Clean Air Act violations in its Complaint, including NSR and NSPS violations at each of Sunoco's refineries.  Certain of these claims are based on facility-specific inspections and investigations.  However, consistent with the intent of EPA's Petroleum Refinery Initiative, described above, EPA has not attempted to investigate and document each potential violation at each facility.  Indeed, the resources required to conduct such investigations at more than 100 national refineries, with thousands of emissions units per refinery, would be staggering.  EPA must be able to use its enforcement resources wisely, such as through effective global settlements under the Petroleum Refinery Initiative.  Therefore, certain claims are based primarily on information and expertise gained by EPA through its work on the Petroleum Refinery Initiative.  Not surprisingly, Sunoco believes that it has strong defenses against the United States' claims and has asserted those

defenses vigorously in negotiations. While the United States believes that its claims are well-founded, there is certainly significant risk that the United States would not prevail on certain of the alleged claims and, even if successful, would not achieve a level of relief comparable in scope or timing to the relief required by the Consent Decree.

Moreover, any litigation involving alleged NSR violations would likely be technically complex, lengthy, expensive, and resource-intensive. For example, recent litigation between the United States and electric utilities regarding alleged NSR violations has proven to be extremely complex and require an enormous resource commitment on the part of the United States. In a recently concluded case that involved alleged violations at only one facility, the parties produced more than 2.6 million pages of documents, the United States proffered 20 experts, and the single question of whether a particular "modification" resulted in a "net emissions increase" – which would also be at issue in any litigation against Sunoco – was the subject of hundreds of pages of expert reports and several days of court testimony.[7] Another case involving NSR violations at a single utility plant was set to move into the remedy phase of trial, and was projected to last six to seven weeks during which the parties expected to offer testimony from more than 40 experts.[8] Moreover, it has taken five years of discovery and contested litigation just to reach the point at which remedy issues will be joined. Implementation of any relief is likely yet another period of years away. These examples underscore the extensive resources, time delay, and uncertainty that would be associated with pursuing Sunoco through traditional enforcement methods for even

_____

[7] United States v. Illinois Power, No. 99-CV-0833-MJR (S.D. Ill.).

[8] Ohio Edison, 276 F.Supp.2d 829 (S.D.Ohio, 2003) Civil No. 2:99-cv-01181. The liability portion of the trial lasted 12 days. The case settled on the eve of the second trial.

a limited subset of the potential violations at each of its four refineries, and that such a strategy could not be expected to produce implementation of remedial measures as quickly as under this Consent Decree even if the United States were ultimately to prevail.

In light of the risks, timing, and resource concerns inherent in litigating its claims on an individual basis, EPA has elected to focus its limited resources on requiring Sunoco to implement the specific emissions reduction programs developed by EPA's team of national experts. The relief negotiated by the United States and Plaintiff-Intervenors and embodied in the Consent Decree is tailored to address the compliance deficiencies alleged in the United States' Complaint and correlates closely with the strength and status of the United States' case and with the relief in other Petroleum Refinery Initiative settlements. The Consent Decree requires Sunoco to utilize the best available control technology, accept more stringent emission limits, and implement other enhancements that will reduce NOx and $SO_2$ emissions across its entire refining system by an anticipated 24,000 tons per year. These reductions will be undertaken in a timely fashion pursuant to a strict schedule enforceable by stipulated penalties. Moreover, Sunoco must incorporate its lower emission limits into federally-enforceable permits that will survive the termination of the Consent Decree. The United States believes the injunctive relief package is at the highest end of the range of possible relief. In addition to the injunctive relief, which is projected to cost hundreds of millions of dollars, Sunoco will also pay a penalty of $3 million and perform supplemental environmental projects in and around its refineries valued, at a minimum, at $3.9 million. Although the penalty is arguably less than the maximum relief potentially available in a fully successful litigation, it is substantial. Overall, this settlement represents a

substantial environmental benefit and is undoubtedly fair given the uncertainty and delay inherent in litigating the relevant claims.

In short, the proposed Decree reflects the parties' careful and informed assessment of the relative merits of each other's claims, while taking into consideration the costs, risks, and time associated with litigating a case of this magnitude. As with any fair settlement, the United States, the Plaintiff-Intervenors, Sunoco, and the public gain from the immediate and certain resolution of the matter, while foregoing the opportunity to seek an unmitigated victory. See EEOC v. Hiram Walker & Sons, 768 F.2d at 889.

The commenters, however, essentially assert that the proposed Decree is not substantively fair, because they perceive the relief required under the Decree to be less than adequate. Although the commenters recognize that the Consent Decree requires the installation of substantial pollution reduction measures, they still claim it is inadequate and in one example state, erroneously, that the relief would be required with or without the decree. This allegation is simply not true. Indeed the decree brings certainty to the remedial landscape at Sunoco's refineries that otherwise could not be assured.

It is further apparent from their statements that the commenters believe that the Clean Air Act regulations should apply in this case as if the United States had already prevailed on every claim against Sunoco. That is simply not the case. The issue before the Court is the adequacy of the Consent Decree, and by definition a Consent Decree embodies a settlement which, as with any settlement, is the product of compromise in which, "in exchange for the saving of cost and elimination of risk, the parties each g[a]ve up something they might have won had they proceeded with the litigation . . . ." City of Jackson, 519 F.2d at 1152 (quoting United States v.

Armour & Co., 402 U.S. 673, 682 (1971)).  The proposed settlement need only be compliant with the applicable standards of review for Consent Decrees.

The commenters have identified specific aspects of the proposed settlement that they believe impact on the substantive fairness of the Consent Decree, and the United States will address each of the specific contentions in the attached Appendix.  However, it is important to note that the commenters' complaints regarding the perceived inadequacy of the proposed relief in the present case are in most instances based on misinterpretation or mischaracterization of the Consent Decree terms.  When the full benefits provided by the Consent Decree are considered in the context of the alternatives to settlement, the Consent Decree clearly meets the standards of substantive fairness.

B.    The Decree Is Reasonable, Adequate and Consistent with the Goals of the Relevant Environmental Statutes.

In determining whether the Decree is "reasonable, adequate, and consistent with the goals of the governing statute," courts have evaluated the following factors: "(1) the nature and extent of potential hazards; (2) the availability and likelihood of alternatives to the Consent Decree, (3) whether the Decree is technically adequate to accomplish the goal of cleaning the environment; (4) the extent to which the Consent Decree furthers the goals of the statutes which form the basis of the litigation; (5) the extent to which the Court's approval of the Consent Decree is in the public interest; and (6) whether the Consent Decree reflects the relative strengths and weakness of the Government's case against the Defendants."  BP Exploration, 167 F. Supp. 2d at 1053 (citing Akzo, 949 F.2d at 1436; Cannons, 899 F.2d at 89-90).

The Decree should be considered reasonable and adequate for many of the same reasons discussed above with respect to substantive fairness. The Decree provides specific, tailored relief ensuring that emissions reductions of pollutants such as NOx,$SO_2$, and benzene will occur across Sunoco's refining system. It obtains this relief in a time frame far shorter than could be expected if the United States engaged in the alternative to settlement, i.e., complex and resource-intensive litigation of all potential claims.

Moreover, the substantial relief achieved through the Consent Decree is in the public interest and consistent with the goals of the Clean Air Act. One of the primary purposes of the Clean Air Act is to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare. 42 U.S.C. § 7401(b)(1). As discussed in detail above, the Consent Decree will substantially reduce the annual emissions of NOx and $SO_2$ from Sunoco's refineries both during and after the life of the Consent Decree. The Decree further requires enhanced controls to reduce fugitive emissions from leaking equipment and benzene emissions from plant operations. Sunoco also will perform supplemental environmental projects valued at a minimum of $3.9 million, including projects that will benefit the communities in the vicinity of the Sunoco refineries. All of these benefits will be achieved in the near term, on an enforceable schedule, without the uncertainty of litigation involving each emission unit. The combined impact of this settlement represents a significant advancement of the Clean Air Act goals.

When evaluating whether a Consent Decree is in the public interest, "[t]he court should bear in mind the flexibility of the public interest inquiry: the court's function is not to determine whether the resulting array of rights and liabilities is the one that will best serve society, but only to confirm that the resulting settlement is within the reaches of the public interest." United States

v. Microsoft Corp., 56 F.3d 1448, 1460 (D.C. Cir. 1995) (internal quotations omitted); U.S. v. Oregon, 913 F.2d at 581 ("[T]he court need not require that the decree be 'in the public's best interest' if it is otherwise reasonable.") (quoting Randolph, 736 F.2d at 529 (emphasis in original)).  While the Consent Decree reflects a compromise based on the technical and legal judgment of the United States, the relief afforded by this settlement provides real benefits to the citizens in the vicinity of the Sunoco refineries and real progress toward the Clean Air Act goals of enhancing air quality and promoting public health and welfare.

The commenters, however, have alleged that certain aspects of the Consent Decree are unreasonable, and that the Decree does not provide adequate relief consistent with the public interest and the goals of the relevant statutes.  As with their arguments concerning substantive fairness, many of these allegations arise from an incorrect interpretation of the Consent Decree's provisions.  The United States will address each specific contention in the attached Appendix.

## V.   THE COMMENTS TO THE PROPOSED CONSENT DECREE DO NOT PROVIDE A BASIS FOR REJECTING THE SETTLEMENT

As noted above, pursuant to 28 C.F.R. § 50.7, the United States published notice of the proposed Decree for public comment and received three submissions in response.  The United States carefully reviewed and considered those comments.  One comment was submitted by the Community Labor Refining Tracking Committee ("CLRTC"), a citizen's group located in Pennsylvania, and directs its comments at the provision of the Consent Decree involving Sunoco's Philadelphia refinery.  A second set of comments was provided jointly by Ohio Citizen Action, Eastside-Oregon Environmental Group, the National Refinery Reform Campaign and Environmental Integrity Project ("collectively referred to as the Ohio Citizen Group") and

specifically references Sunoco's refinery in Toledo, Ohio. A third comment was sent in by an individual, B. Sachau, from Florham Park, NJ who criticizes only the size of the penalty. The comments are attached to this memorandum. The comments address several topics including the adequacy of the emission and monitoring requirements and the adequacy of the penalties. One commenter suggests that this Court reject the settlement and reopen negotiations. Besides being an inappropriate remedy by the Court as explained above, such a result would be disastrous as it would lead to no better injunctive relief and longer delays in obtaining the corrective measures that are essential to the environment.

In sum, the United States has carefully considered all of the comments received, and a detailed response to each comment is presented in the attached Appendix. After a thorough evaluation of the issues presented, the United States has concluded that none of the comments warrants either a change to the settlement terms or the wholesale rejection of the proposed Decree.

## VI. CONCLUSION

The agreement now before the Court was reached after the parties' careful and informed assessment of the merits of the case, the costs, risks and delays that litigation would entail, and the value of an early settlement, including the significant environmental benefits that will accrue from Sunoco commencing many of the comprehensive injunctive measures contained in the proposed Decree immediately or within the first few years. As explained above, the proposed settlement is fair, adequate and reasonable, and consistent with the goals of the Clean Air Act. Because the public comments submitted on the proposed Decree do not provide a basis for the

United States to withhold its consent to the settlement, the United States requests that this Court

approve and enter the proposed Consent Decree as a final judgment.


Respectfully submitted,

THE UNITED STATES OF AMERICA

KELLY A. JOHNSON
Acting Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

**//s// Michael J. McNulty**
MICHAEL J. McNULTY, Trial Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Phone:  (202) 514-1210
Fax:  (202) 514-4180
Attorney-in-Charge for the United States

PATRICK L. MEEHAN
United States Attorney
Eastern District of Pennsylvania

MARGARET L. HUTCHINSON
Assistant United States Attorney
Pennsylvania Bar No.
616 Chestnut Street, Suite 1250
Philadelphia, Pennsylvania 19106

OF COUNSEL:
BRUCE FERGUSSON
Attorney-Advisor
U.S. Environmental Protection Agency
1200 Pennsylvania Ave, NW
Washington, DC 20460

# CERTIFICATE OF SERVICE

As per the Eastern District of Pennsylvania, Electronic Case Filing System, Attorney User

Manual, Procedural Order Rule 7(a) & (b), I hereby certify that I caused a copy of the foregoing

## UNITED STATES MOTION TO ENTER CONSENT DECREE
and
## MEMORANDUM IN SUPPORT OF UNITED STATES'
## MOTION TO ENTER CONSENT DECREE

to be served upon the parties and their counsel identified on the list below via Federal Express,

Priority Delivery or USPS First Class Priority, postage pre-paid, and/or direct Electronic

Notification to those recipients having consented to electronic service.

September 26, 2005                              **//S// Michael J. McNulty**

                                               MICHAEL J. McNULTY
                                               Trial Attorney
                                               Environmental Enforcement Section
                                               U.S. Department of Justice
                                               P.O. Box 7611
                                               Washington, D.C. 20044
                                               (202) 514-1210
                                               michael.mcnulty@usdoj.gov

**SERVICE LIST***

*Indicates Party to Action

**PLAINTIFF INTERVENORS**

**THE COMMONWEALTH OF PENNSYLVANIA***

JOSEPH A. FEOLA
REGIONAL DIRECTOR
SOUTHEAST REGIONAL OFFICE
COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF ENVIRONMENTAL PROTECTION
2 EAST MAIN STREET
NORRISTOWN, PA 19401-4915
T: 484.250.5816
F: 484.250.5943

DOUGLAS G. WHITE
ASSISTANT COUNSEL
SOUTHEAST REGIONAL OFFICE
COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF ENVIRONMENTAL PROTECTION
2 EAST MAIN STREET
NORRISTOWN, PA 19401
T: 484.250.5816
F: 484.250.5943
douwhite@state.pa.us

**CITY OF PHILADELPHIA***

PATRICK K. O'NEILL
DIVISIONAL DEPUTY CITY SOLICITOR, ENVIRONMENTAL LAW
CITY OF PHILADELPHIA LAW DEPT.
ONE PARKWAY BLDG. 16TH FLOOR
1515 ARCH STREET
PHILADELPHIA, PA 19102

T: 215.683.5172
patrick.o'neill@phila.gov

MORRIS FINE
DIRECTOR
PHILADELPHIA AIR MANAGEMENT SERVICES
321 UNIVERSITY AVENUE, SECOND FLOOR
PHILADELPHIA, PA 19104
T: 215.685.7585

**THE STATE OF OKLAHOMA***

STEVEN A. THOMPSON
EXECUTIVE DIRECTOR
OKLAHOMA DEPARTMENT OF ENVIRONMENTAL QUALITY
707 NORTH ROBINSON
P.O. BOX 1677
OKLAHOMA CITY, OKLAHOMA 73101-1677
T: 405-702-1000
F: 405-702-1001

**THE STATE OF OHIO***

JOHN K. MCMANUS
ASSISTANT ATTORNEY GENERAL
ENVIRONMENTAL ENFORCEMENT SECTION
30 EAST BROAD STREET, 25TH FLOOR

COLUMBUS, OHIO 43215-3400
T: 614.466.3840
F: 614.752.5083
jkmcmanus@ag.state.oh.us

**DEFENDANT**
**SUNOCO, INC.**\*

JOEL H. MANESS
SENIOR VICE-PRESIDENT
SUNOCO, INC.
1801 MARKET STREET
PHILADELPHIA, PA 19103
T: 215.567.0249

THOMAS S. STAMMEL
SENIOR COUNSEL
SUNOCO INC. (R&M)
100 GREEN STREET
P.O. BOX 26
MARCUS HOOK, PA 19103
T: 610.859.6363

**COURTESY COPIES**

PATRICK L. MEEHAN
UNITED STATES ATTORNEY
EASTERN DISTRICT OF PENNSYLVANIA
615 CHESTNUT STREET  SUITE 1250
PHILADELPHIA, PA 19106
T:  215. 861.8200

MARGARET L. HUTCHINSON
ASSISTANT UNITED STATES ATTORNEY
EASTERN DISTRICT OF PENNSYLVANIA
615 CHESTNUT STREET  SUITE 1250
PHILADELPHIA, PA 19106
T:  215. 861.8200

BRUCE FERGUSSON
2248A
USEPA HEADQUARTERS
ARIEL RIOS BUILDING
1200 PENNSYLVANIA AVENUE, N. W.
WASHINGTON, DC 20460
202-564-1261
fergusson.bruce@epa.gov

RHONDA JEFFRIES - CRAIG
ADMINISTRATIVE PROGRAMS DIRECTOR
OKLAHOMA DEPARTMENT OF
ENVIRONMENTAL QUALITY
707 N. ROBINSON
OKLAHOMA CITY, OK 73102
T: 405-702-1000
F: 405-702-1001
rhonda.jeffries@deq.state.ok.us

BERNIE TURLINSKI
OFFICE OF AIR PROTECTION
EPA REGION III
1650 ARCH STREET
MAIL CODE 3AF10
PHILADELPHIA, PA  19103
T:  215.814.2052

WILLIAM WAGNER
ASSOCIATE REGIONAL COUNSEL
EPA REGION 5
77 WEST JACKSON BLVD.
MAIL DROP C14J
CHICAGO, IL 60604=3590
T:  312.886.4684
wagner.william@epa.gov

RUSTY HERBERT
6RC-EA
USEPA REGION 6
1445 ROSS AVENUE
SUITE 1200
DALLAS, TX 75202-2733
214-665-3197
herbert.rusty@epa.gov

ROBERT BRAGER, ESQ.
BEVERIDGE & DIAMOND, P.C.
201 NORTH CHARLES STREET
SUITE 2210
BALTIMORE, MD  21201-4150
T: 410.230.3855
F: 410.230.3868
rdrager@bdlaw.com

AMY LINCOLN, ESQ.
BEVERIDGE & DIAMOND, P.C.
1350 I STREET N.W.
WASHINGTON, D.C. 20005-3111
T: 202.789.6000F
F: 202.789.6190

MARCIA JOHNSON
CIVIL CHIEF
OFFICE OF US ATTORNEY
NORTHERN DISTRICT OF OHIO
801 WEST SUPERIOR AVENUE
SUITE 400
CLEVELAND, OH  44113-1852
T: 216.622.3670

KEVIN G. LEITCH
CIVIL CHIEF
OFFICE OF US ATTORNEY
NORTHERN DISTRICT OF OKLAHOMA
110 W. SEVENTH ST.
SUITE 300
TULSA, OK 74119
T: 918.382.2710

**COMMENTER**S

MICHAEL D. FLORENTINE, ESQ.
MID-ATLANTIC ENVIRONMENTAL LAW
CENTER obo/
THE LABOR REFINERY TRACKING
COMMITTEE
4601 CONCORD PIKE
PO BOX 7474.
WILMINGTON, DE 19803-0474
(302) 477-2182

SANDY BUCHANAN, EXECUTIVE DIRECTOR
TODD PINCOMBE, PROGRAM DIRECTOR
OHIO CITIZEN ACTION
614 W. SUPERIOR AVE.
SUITE 1200
CLEVELAND, OH 44113

EASTSIDE-OREGON ENVIRONMENTAL GROUP
1103 MAMBRINO RD.
OREGON, OH 43616

DENNY LARSON
DIRECTOR /  GLOBAL COMMUNITY MONITOR
NATIONAL REFINERY REFORM CAMPAIGN
222 RICHLAND AVE.
SAN FRANCISCO, CA 94110

KELLY HARAGAN, COUNSEL

EQUAL JUSTICE WORKS FELLOW

<u>ENVIRONMENTAL INTEGRITY</u>

<u>PROJECT</u>

919 18TH ST., NW

SUITE 650

WASHINGTON, D.C. 20006


MS. BARBRA. SACHAU

15 ELM STREET

FLORHAM PARK,  NJ 07932